which the defendants sought to require the plaintiff to make the complaint more definite and certain.

The order appealed from should be reversed, with $10 costs and disbursements, and the motion granted to the extent indicated, with $10 costs. All concur.

(70 App. Div. 427.)

LEHIGH VAL. RY. CO. et al. v. ADAM et al., Grade Crossing Com'rs.

(Supreme Court, Appellate Division, Fourth Department. March 11, 1902.)

1. RAILROADS — MUNICIPAL CORPORATIONS — REGULATION OF CROSSINGS — STATUTES.

    Under Laws 1888, c. 345, authorizing commissioners therein appointed to contract with railroads for the relief of the city of Buffalo from obstruction of streets by railroad crossings at grade, on a plan then on file with the city engineer, a contract was entered into and carried out with plaintiffs' road for certain changes of grade and erection of viaducts. The act was amended by Laws 1892, c. 353, providing for the making of contracts from time to time by a "plan adopted or to be adopted by said commissioners as hereinafter provided," and the commissioners were given power to adopt a general plan, and to "alter, amend or modify" the same as to any detail, but were prohibited from adopting a general plan extending beyond the one theretofore adopted, or from extending the general plan adopted by them. Held, that the act authorized the adoption of a plan raising the tracks of plaintiffs' railroad for a distance of about three-quarters of a mile, including the construction of overhead crossings and of an elevated railroad on the plaintiffs' property 15 feet above the streets, but with no change or extension of the line as to the route or crossings.

2. SAME—CONSTITUTIONAL LAW—POLICE POWER.

    The act was a valid exercise of the police power, and was not a violation of the constitutional inhibition on the impairment of contracts.

Appeal from special term, Erie county.

Proceedings by the Lehigh Valley Railway Company and the Lehigh Valley Railroad Company against Robert B. Adam and others, grade crossing commissioners, to restrain defendants from adopting a plan for raising plaintiffs' railway tracks and abolishing grade crossings. From a judgment for plaintiffs, defendants appeal. Reversed.

Argued before McLENNAN, SPRING, WILLIAMS, HISCOCK, and DAVY, JJ.

Spencer Clinton, for appellants.

Martin Carey and James McMitchell, for respondents.

WILLIAMS, J. The judgment appealed from should be reversed, and a new trial ordered, with costs to the appellants to abide event. The judgment permanently restrained the defendants from adopting any alteration, change, or extension of the general plan theretofore adopted, under the provisions of the Buffalo grade crossing law, that would in any way affect the existing condition of the tracks and property of the plaintiffs, between Alabama and Washington streets in the city of Buffalo, and from in any way interfering with the railroad and property of the plaintiffs. The existing condition of the tracks and railroad was that it traversed the location in question at grade,

and the proposed change was to elevate the tracks and roadbed above grade, on an elevated structure. It was claimed by the plaintiffs that the defendants could not make the change because: (1) It would violate the contract rights of the plaintiffs, acquired under a municipal franchise granted by the city of Buffalo, and under an agreement with grade crossing commissions for the city, theretofore made and granted; (2) no power was given defendants so to do, by the legislature of the state; (3) if any such power was given by the legislature, it was unconstitutional and void. The decision of the trial court was apparently based upon the first two grounds, the constitutional question not being passed upon. The plaintiffs insist upon the constitutional question here, however, in case it shall be deemed essential to an affirmance of the judgment. The facts in the case, stated as briefly as possible, are as follows: The plaintiffs' railroad was originally constructed by the railroad company, a Pennsylvania corporation, and was leased to the railway company, a domestic corporation, about the year 1890, and has since been operated by the latter company. The original franchise to run through the city of Buffalo was granted in 1882, and through the locality in question was to be at grade, from Alabama street westerly to its terminus at Washington street. This franchise was further ratified and approved in 1885, and the roadbed was constructed prior to 1888, and has been operated since that time. Down to September, 1892, the part of the road in question was operated solely for freight, the passenger business, by a traffic arrangement with the Erie Railroad, going over the tracks, and into the passenger station, of the latter company. Since September, 1892, the part of the road in question has been used for both freight and passenger business. February 20, 1888, a commission of engineers was held at Buffalo, for the purpose of recommending a plan for the relief of the streets of that city, by railroads crossing the same at grade, and a plan was recommended by that commission, and was filed in the office of the engineer of the city. That plan, however, provided for no change of grade of that part of the plaintiffs' road in question here. In May, 1888, the legislature passed chapter 345, of the Laws of that year, which provided, by section 1, that any six of the commissioners therein appointed were authorized to enter into a contract, in behalf of the city of Buffalo, with any railroad companies for the relief of the city from obstruction to streets by railroads crossing the same at grade upon the plan recommended by the commission of engineers, then on file in the office of the city engineer of Buffalo, or any modification thereof as to detail agreed upon in such contract, subject to approval of the city engineer and that such contract should be binding upon the city, and, by section 5, that if, within six months from the passage of the act, the railroad companies declined or refused to enter into such a contract, then the city might apply to the supreme court upon notice to the railroad companies, for the appointment of a commission of five persons, to change and regulate the crossing and occupation by railroads of the streets, avenues, and public grounds of the city. There were then provisions, by subsequent sections, for the carrying out of the objects of the act. On the last day of the six months from the passage of the act, and November 22, 1888, the commissioners named in section 1 entered

into a contract with the plaintiff railroad company for certain changes in the grade of the roadbed and tracks of the railroad, and of the streets, and for erections, viaducts, and cuttings, to be made by the parties, according to detail plans prepared and placed on file in the city engineer's office, and the proportions of the expenses thereof to be paid by each party, respectively, and the contract so made was carried out and complied with by the railroad company. Under this contract the tracks and roadbed at Michigan street were raised about two feet. In 1890, by chapter 255 of the Laws of that year, the act of 1888 was amended, and again in 1892, by chapter 353 of that year, the acts of 1888 and 1890 were further amended. By the amendment in 1890 of section 5 of the act of 1888, the commissioners appointed in the original act were substituted for the second commission under the original act, and were directed to proceed to secure the relief to the city from the crossing of streets, alleys, and public grounds, by railroads, at grade. This section, however, apparently related only to such railroad companies as should have failed to enter into a contract under section 1 of the original act, and the plaintiffs were very likely thereby excluded from the provision of this amendment. By section 6 of the original act, as amended in 1890, the new commission was directed to adopt the general plan mentioned in section 1 of the original act, which was the plan recommended by the commission of engineers in 1888, and they were prohibited from changing this original plan in any material part, and were given power to make new contracts, and by agreement with the contracting company to alter, modify, or change any contract theretofore made. By the amendment of 1892, section 1 of the original act was changed, so as to provide for the making of "contracts from time to time," reference to the plan adopted by the commission of engineers was omitted, and in its place were inserted the words, "plan adopted or to be adopted by said commissioners, as hereinafter provided"; then, by section 6 of the original act, as again amended by this act of 1892, the commission were given power to adopt a general plan, and from time to time to alter, amend, or modify the same as to any detail, but were prohibited from adopting a general plan extending beyond the one theretofore adopted under which contracts had already been entered into, and from extending the general plan adopted by them. The commissioners, pursuant to this act, on the 19th of November, 1893, adopted and filed a general plan, which included no change in the line of plaintiffs' railroad, and dealt with the same crossings, and in substantially the same manner, as the general plan recommended by the commission of engineers in 1888. It was not until December 11, 1899, however, that the commissioners took the action which led to the commencement of this suit. Then, in compliance with the provisions of the statute, they served upon the plaintiff railroad company a notice that they proposed to adopt a modification, amendment, or alteration of the general plan theretofore adopted and filed, and that on December 27, 1899, they would hear the city, the plaintiff railroad company, and all other persons interested, with reference thereto.

The proposed change involved the raising of the tracks of the plaintiffs' railroad from Alabama street to Washington street, about

three-fourths of a mile, including the construction of overhead crossings at the intersection of streets, and an elevated railroad through and along Scott street, and upon the plaintiffs' own property, at least 15 feet above the surface of the street, the structure across and along the streets to be of steel, with stone abutments and steel columns. The trial court decided that this change was not a modification, alteration, or amendment, but was an extension of the general plan theretofore adopted and filed, and under which the contract was made between the plaintiffs and defendants; that it would be a violation of that contract, and of the franchise granted to the plaintiff by the city, to require such change to be made in the tracks and roadbed of the plaintiffs' road, and that the commissioners were never authorized by the legislature to make such change in the general plan, or in the railroad structure; and, inasmuch as the franchise had never been abrogated, and the plaintiffs had never consented to such change, the commissioners had no power to make the same. Upon such decision, the judgment appealed from was ordered.

It does not appear that the hearing noticed for December 27, 1899, ever in fact was had. It seems to have been adjourned until February 1, 1900, and on the latter day this action was commenced, and a temporary injunction served, which was subsequently continued during the pendency of the action. We are of the opinion that the commissioners were authorized, under the acts of the legislature referred to, to make the change in the general plan proposed. By the act of 1892, they were given the power to adopt a general plan (not necessarily the same one already adopted), and from time to time to alter, amend, or modify the same as to any detail. They were only prohibited from adopting a general plan extending beyond the one theretofore adopted, under which contracts had already been entered into, and from extending the same after it had once been adopted. The commission did adopt a general plan in 1893, which did not extend beyond the one theretofore adopted. They sought, in 1899, to alter, amend, or modify the general plan of 1893, and the question is whether the change proposed related merely to a detail of such general plan, or whether it constituted an extension of such general plan. No change in the line—no extension thereof—was proposed. The same streets and crossings and territory were treated of. To extend the general plan was to enlarge its scope, so as to take in other streets, crossings, or territory, not embraced in the original plan. It would be a forced construction of the statute to hold that it did not permit any change to be made in the grade of the roadbed, rendered necessary by any growth of the city or increase in the use of the streets, or enlargement of the traffic over the railroad, in order to insure the safety of the public in traveling the streets. Until 1892 the passenger trains of the plaintiffs were run over the tracks of the Erie Railroad, and into its depot. Only the small freight business of the plaintiffs was done over the part of the plaintiffs' road in question. Since then the whole passenger and freight business of the plaintiffs has been done over this part of its road, and fast passenger trains have been run here. This has so changed the condition of things that the safety of the community demands that these dangerous grade crossings shall be eliminated.

Assuming that the legislature might authorize this change to be made, we think a fair construction of the act of 1892 gives the commissioners power to make the change in the general plan of 1893, and to compel the plan so changed to be complied with, and the roadbed and tracks to be elevated so as to remove the grade crossings in question.

The legislature had power to appoint a commission and authorize it to take proceedings to remove grade crossings in the city of Buffalo. These crossings in large cities are quasi public nuisances, and their abolition is the subject of the police power of the state, which can, by the legislature, provide for their removal, and the franchises granted to railroads by cities, and contracts entered into between railroads and cities, are subject to the exercise of such police power. The constitutional inhibition upon the impairment of contracts and the taking of property without due process of law are not violated by the exercise of such police power in securing the public safety by the abolishing of grade crossings. New York & N. E. R. Co. v. Town of Bristol, 151 U. S. 556–567, 14 Sup. Ct. 437, 38 L. Ed. 269; Wabash R. Co. v. City of Defiance, 167 U. S. 88, 17 Sup. Ct. 748, 42 L. Ed. 87; Chicago, B. & Q. R. Co. v. State of Nebraska, 170 U. S. 57–74, 18 Sup. Ct. 513, 42 L. Ed. 948. It was held in those cases that it was not only within the power, but was also the duty, of the state, through its legislature, to provide for and secure to the community the safety of railroad crossings of streets in large cities; that it was within the police power of the state; and that it could not be contracted away by any agreement between the cities and the railroad companies; that any other view involved the proposition that it was competent for the city and the railroad companies, by entering into agreements between themselves, to withdraw the subject from the reach of the police power, and to substitute their view of the public necessities for those of the legislature; and that the acts passed by the legislature, in the legitimate exercise of the police power, in securing public safety at street crossings by railroads in cities, were constitutional and valid. It was also held that this power might be exercised through the medium of a commission such as was constituted in this case.

It seems to us, therefore, that the only question here to be seriously considered is whether the legislature has clothed the defendants with power to take the action proposed, to make the change in the general plan already adopted, and require it to be complied with, so that the tracks of the plaintiffs' railroad shall be elevated above the streets intersected and traversed thereby, instead of crossing and running along such streets at grade. The language of the acts of the legislature might have been clearer than it is, but we are of the opinion that, by the fair construction thereof, such power has been given the grade-crossing commissioners.

Whether the result of such change of plaintiffs' tracks and roadbed will injuriously affect the plaintiffs' property or business, is not for this court to consider. That is a question which should be addressed to the commission. The question before the court is one of power in the commission to act, to take the proceeding which it had instituted, and which the judgment appealed from enjoined.

The views here expressed lead to the conclusion that the judgment

appealed from was erroneously ordered, and that it should be reversed, and a new trial ordered, with costs to appellants to abide event.